JOAN S. FELDMAN *vs.* BENJAMIN FELDMAN & another.[1].

Norfolk. April 12, 1985. — July 1, 1985.

Present: KASS, CUTTER, & SMITH, JJ.

*Tenancy by the Entirety. Husband and Wife,* Tenancy by the entirety. *Real Property,* Mortgage. *Notice.*

In an action by a wife against both her former husband who, pursuant to a judgment of divorce, had been ordered to transfer to her all his interest in the marital home they owned as tenants by the entirety, and a third party to whom the husband had given a mortgage of his interest in the home, seeking a declaration that the mortgage was invalid and that the plaintiff held title to the locus, the judge's finding of a joint and improper effort by the husband and the third party to give security for assets which they then employed to obtain the husband's release from an order of contempt for his failure to make support payments, to encumber the husband's interest in the locus, and to frustrate the award of that interest to the plaintiff, warranted the conclusion that the mortgage to the third party should be set aside. [311-314]

CIVIL ACTION commenced in the Norfolk Division of the Probate and Family Court Department on May 23, 1983.

The case was heard by *B. Joseph Fitzsimmons, Jr.,* J.

*Stephen E. Shamban (Cheryl A. Salden* with him) for Bonnie LaMothe.

*Edith Greene,* for Benjamin Feldman, was present but did not argue.

*Peter J. Schneider* for Joan S. Feldman.

CUTTER, J. Joan and Benjamin Feldman, husband and wife (at least during most of the proceedings described below), owned a house and land in Sharon (the locus) as tenants by the entirety after 1976. On December 15, 1982, Joan was granted by probate judge No. 1 a divorce nisi from Benjamin

[1] Bonnie LaMothe.

on the ground of adultery. He, by the judgment nisi, was ordered to transfer within ten days to Joan all his interest in the locus. The judgment nisi, although dated December 15, 1982, was not recorded on the Probate Court docket until December 21, 1982.

On December 15, 1982, Benjamin was adjudged in contempt, also by probate judge No. 1 for failure to make support payments to Joan and for their children. He was committed to a house of correction for sixty days or "until he shall purge himself of . . . contempt by payment of $10,100." Benjamin then, within a few hours, borrowed from or was furnished $10,100 by (or through) the defendant Bonnie LaMothe and was released from custody.[2]

LaMothe and Benjamin went together to New Hampshire and consulted a lawyer there. The lawyer drew a promissory note for $10,100 for Benjamin to sign and a mortgage of Benjamin's interest in the locus (i.e., the marital home in Sharon). On the face of the mortgage it was shown that the locus consisted of "the same premises conveyed to Benjamin Feldman and Joan Feldman by deed . . . dated November 2, 1976" recorded with Norfolk deeds, and "[s]ubject to a prior first mortgage." The mortgage was promptly recorded on December 16,[3] prior to the filing in the registry of deeds of any lis pendens concerning the divorce proceeding.

Neither Benjamin nor LaMothe spoke with Joan before the mortgage was given, nor was Joan notified that the mortgage

---

[2] There was evidence that Benjamin, while he was still at the courthouse, placed a telephone call to LaMothe, then in New Hampshire. She obtained funds from a safe deposit box and from a purse containing cash kept by her in her house, procured a certified check to her order, and (within a matter of hours) took the check to the Dedham courthouse, and there was able to arrange Benjamin's release. She had not arranged theretofore to obtain any security for the transfer of the funds. She endorsed the check to Joan Feldman. From the testimony, the funds used by LaMothe could have been found to have been her personal resources or, perhaps, funds of a business enterprise of which she and Benjamin each was or had been an officer.

[3] The note does not appear in the record and LaMothe, who testified that it was in her deposit box, was shown to have given earlier conflicting testimony concerning where the note was at the time of trial of this complaint.

had been executed. Benjamin did not convey his interest in the locus to Joan as directed by the judgment nisi. An order, dated January 3, 1983, of probate judge No. 1 purported to divest Benjamin of his interest in the locus and award it to Joan.

The present "complaint in equity" was filed in behalf of Joan on May 23, 1983. It seeks, among other forms of relief, (a) a declaration that the mortgage to Lamothe is invalid and that Joan holds title to the locus free of any lien of the mortgage, and (b) that Benjamin and LaMothe each be required to discharge the mortgage. The complaint was heard for two days before probate judge No. 2 on April 30 and May 1, 1984. There was evidence before him of the facts already recited, as well as somewhat conflicting evidence that for a substantial period before December 15, 1982, there had existed between Feldman and LaMothe (1) a close business relationship in a corporation formed in New Hampshire to distribute Montessori school supplies, and (2) a personal relationship which had originated when Benjamin had taken his son (apparently, according to the testimony, by a woman other than Joan) to the Montessori school in Salem, New Hampshire, run by LaMothe and an associate. The relationship had involved LaMothe and Benjamin living at the same address in circumstances which (on the testimony) would permit a variety of inferences.[4] There was testimony from Ann Neubert, a former (and now disillusioned or possibly disgruntled) business partner of LaMothe of circumstances showing a close business and personal relationship between Benjamin and LaMothe. Miss Neubert explicitly testified that LaMothe told her in the spring of 1981 that she (LaMothe) was "in love" with Benjamin.

LaMothe conceded (a) that, after December 15, 1982, she made substantial payments to Benjamin (on invoices for services rendered by him to their corporation estimated by LaMothe at $8,000 to $9,000), (b) that no payments had been made by

---

[4] There was evidence that Benjamin told Joan that LaMothe "babysat" for Benjamin's (but not Joan's) child and there was some suggestion that LaMothe with Benjamin had visited Colby College where Joan's son was a student.

Benjamin on the mortgage note at any time, and (c) that LaMothe had not claimed any set-off of, or claim upon, the later payments made to Benjamin by her against his liability to her on the note.

Probate judge No. 2 found essentially the basic facts which had been stipulated by the parties at the opening of the hearings. He then found: (1) "that a close personal relationship existed between" Benjamin and LaMothe "as early as 1981"; (2) that the purported mortgage of December 15, 1982, was a "less than arm's length" transaction; (3) that Benjamin and LaMothe "had been engaged in a close business relationship" long prior to December 15, 1982; (4) that Benjamin knew or should have known when he executed the mortgagè to LaMothe, the possibility of his being divested by the divorce nisi from at least part of his interest in the locus, and that his purported mortgage of his interest was "at least unfair and inappropriate" and a fraud upon Joan and the court; and (5) that the mortgage was a "bold attempt by" Benjamin and LaMothe, "*in conspiracy, to . . . encumber a marital asset*" (emphasis supplied).

The judge was not required to believe the testimony of LaMothe and obviously did not do so in large measure. He expressly referred to her testimony as "evasive." Her credibility had been shaken by cross-examination in various respects. See, e.g., note 3, *supra*. Of course, the judge's disbelief of all or some of LaMothe's testimony, see *O'Connell* v. *Esso Standard Oil Co.*, 337 Mass. 639, 642 (1958), does not constitute evidence to the contrary. The judge, however, reasonably could have inferred from the evidence already summarized that LaMothe, at least by the time she paid over her cashier's check to Joan on December 15, 1982, knew facts affecting the validity of the mortgage. She then must have known that Benjamin was married to Joan and that he needed $10,100 to discharge his past support obligations. She must have known also of the impending divorce, and of Joan's interest in the locus. Indeed, Joan's interest was apparent on the face of the mortgage accepted by LaMothe, as already stated. The close business and personal relationship, referred to in the evidence (and found by the judge), between LaMothe and Benjamin per-

mitted an inference that she had known most of the pertinent circumstances at a much earlier date.

The judge appropriately should have made more complete and explicit subsidiary findings. We think, however, that his finding that Benjamin and LaMothe engaged "in [a] conspiracy" to encumber a marital asset necessarily imports a finding of a joint and improper effort by Benjamin and LaMothe (a) to give security for the assets employed to produce Benjamin's release from the contempt order, (b) to encumber Benjamin's interest in the locus, and (c) to frustrate the award of that interest to Joan. The judge reasonably could conclude that the mortgage to LaMothe should be set aside, whether the assets used to secure Benjamin's release were the property of LaMothe alone or in part were assets of a business in which both she and Benjamin had an interest.

LaMothe contends that Benjamin, prior to a recording in the registry of deeds by Joan disclosing the divorce proceedings or the divorce judgment nisi, was entitled to dispose of his interest in the estate by the entirety in any way permitted by the common law view of a husband's interest in such an estate and that this record shows nothing that put LaMothe on notice of any inability of Benjamin to secure by the mortgage her transfer of funds to him. She relies, in large measure, on G. L. c. 184, § 15, and cases applying that statute. See, e.g., *Debral Realty, Inc.* v. *DiChiara,* 383 Mass. 559 (1981); *True* v. *Wisniowski,* 13 Mass. App. Ct. 501 (1982).[5]

---

[5] Section 15, as appearing in St. 1941, c. 88, reads in part: "A . . . proceeding, either at law or equity, which affects the title to real property . . . shall not have any effect *except against the parties thereto and persons having actual notice thereof*" (emphasis supplied) until a lis pendens notice is recorded in the appropriate registry of deeds. In the *Debral* case, 383 Mass. at 560, it was said, "Under the common law doctrine of lis pendens, the mere existence of litigation involving title to real property was deemed constructive notice to the world, so that anyone who purchased the disputed property while the suit was pending was bound by the judgment ultimately rendered," and (at 560-561) § 15, "first appearing in St. 1877, c. 229, ameliorated the harsh effects of the common law rule on *good faith* transferees unaware of pending litigation concerning the property" (emphasis supplied). The present litigation, perhaps, might have been avoided if a lis pendens had been filed when the divorce proceeding was commenced.

On the findings of the judge, we think that LaMothe must be taken to have had actual notice and knowledge of the divorce litigation. Such litigation necessarily involved the consideration of all interests in marital real estate pursuant to the revision of G. L. c. 208, § 34, by St. 1974, c. 565 (now as amended through St. 1983, c. 233, § 77). Section 34, of course, since 1974 has permitted equitable division of marital property upon divorce. LaMothe's knowledge and participation with Benjamin in an effort to perfect a mortgage of Benjamin's interest in the locus was found by probate judge No. 2, as has been noted, to amount to a "conspiracy" to deprive Joan of that interest. Such an interference with the division of the marital estate is activity not within the purpose of c. 184, § 15, to protect transferees in good faith.[6] In the circumstances (on the findings of probate judge No. 2), § 15 and the authorities applying that section do not control the present case.[7]

*Judgment affirmed.*

---

[6] We perceive nothing in the first paragraph of G. L. c. 208, § 34A, as appearing in St. 1975, c. 400, § 34, which requires a different result. That § 34A (creating an equitable right in a spouse as a consequence of a judgment for alimony in a divorce proceeding) is "subject to the provisions for recording of notice" in G. L. c. 184, § 15, by reason of § 15 itself has no application to a person with actual notice of the divorce proceedings, at least after the enactment of St. 1974, c. 565.

[7] In our view of this case, we need not consider issues argued by the parties concerning the effect, if any, of the so called "equal rights" amendment, art. 106 of the Amendments to the Constitution of the Commonwealth, ratified in 1976, upon the power of either spouse (without the participation of the other spouse) to convey an interest in a previously created estate by the entirety. See *West* v. *First Agricultural Bank*, 382 Mass. 534, 544-552 (1981), and authorities there cited. See also an opinion of Sullivan, J., of the Land Court, decided March 21, 1983, in *Inge* v. *Inge*, Misc. No. 108279, brought to our attention by Joan's counsel as discussing such issues which we need not and do not decide.

We recognize that a husband's interest in an estate by the entirety may be taken into account in enforcing an order for alimony (or for a division of property). See *Krokyn* v. *Krokyn*, 378 Mass. 206, 208-211 (1979). If it is necessary for a husband to liquidate his interest to avoid contempt, suitable relief can be made available by the Probate Court after notice to the wife.